**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

JAMES C. FUDGE,
ADC #78875                                                                                                              **PLAINTIFF**

V.                                                5:14CV00431-JLH-JTK

GRANT HARRIS, et al.                                                                                  **DEFENDANTS**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

**INSTRUCTIONS**

      The following recommended disposition has been sent to United States District Judge J. Leon Holmes. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in waiver of the right to appeal questions of fact.

      If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

      1.     Why the record made before the Magistrate Judge is inadequate.

      2.     Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

      3.     The detail of any testimony desired to be introduced at the hearing before the District

Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

> Clerk, United States District Court
> Eastern District of Arkansas
> 600 West Capitol Avenue, Suite A149
> Little Rock, AR 72201-3325

## DISPOSITION

### I. Introduction

Plaintiff Fudge is a state inmate incarcerated at the Varner Super Max (VSM) Unit of the Arkansas Department of Correction (ADC). He filed this pro se action pursuant to 42 U.S.C. § 1983, alleging violations of due process connected with his continuous assignment to administrative segregation, punitive isolation, and the VSM Behavior Modification Incentive Level Program[1] for fifteen years. (Doc. No. 4, p. 4) Plaintiff asks for monetary and injunctive relief, including transfer to the Tucker or Wrightsville Unit. (Id., p. 6)

Pending before the Court is the Defendants' Motion for Summary Judgment, Brief in Support, and Statement of Facts (Doc. Nos. 40-42), to which Plaintiff filed a Response, Brief, and Statement of Facts (Doc. Nos. 50-52).

### II. Amended Complaint (Doc. No. 4)

Plaintiff states he was committed to the ADC in 1999, and alleges he has been housed

---

[1] Doc. No. 40-2.

indefinitely in solitary or administrative confinement for more than eight years, based on his past history misconduct. (Doc. No. 4, p. 4) He claims that the periodic reviews conducted by Defendants were meaningless and retaliatory, due to his past misconduct. (Id.) He also claims he was housed in administrative segregation (ad-seg), the incentive program, and punitive isolation continuously for fifteen years, thereby creating an atypical and significant hardship in violation of his due process rights. (Id.) Plaintiff alleges Defendant Harris told him in February, 2006, that Plaintiff would die in a solitary cell before Harris voted to release him, and that Defendant Jackson vowed never to release Plaintiff to general population in November, 2007. (Id.) He protests a review conducted in August, 2010, which placed him in the 18-month incentive level program, and states that the periodic reviews conducted during his time in that program were meaningless and retaliatory, and based on his past misconduct. (Id.) Defendant Watson permitted the Defendants' conduct in 2013 and 2014 and Harris called his December, 2014, request to be placed in general population "a tall order." (Id., p. 5) Defendants Banks, Meinzer and Harris also violated his rights by failing to overturn the classification decisions. (Id.)

Plaintiff's continuous placement in these confinements has resulted in muscle atrophy, muscle seizures, hypertension, arthritis, and acid reflux disorder. (Id.) In addition, he suffers from obesity and pain due to various untreated medical conditions. (Id.)

### III.   Summary Judgment Motion

Pursuant to FED.R.CIV.P. 56(a), summary judgment is appropriate if the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Dulany v. Carnahan, 132 F.3d 1234, 1237 (8th Cir. 1997). "The moving party bears the initial burden of identifying 'those portions of the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Webb v. Lawrence County, 144 F.3d 1131, 1134 (8th Cir. 1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (other citations omitted)). "Once the moving party has met this burden, the non-moving party cannot simply rest on mere denials or allegations in the pleadings; rather, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'" Id. at 1135. Although the facts are viewed in a light most favorable to the non-moving party, "in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." Id.

### A. Official Capacity Immunity

The Court agrees with Defendants' initial argument that Plaintiff's monetary claims against them in their official capacities are barred by sovereign immunity. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989).

### B. Statute of Limitations

Defendants next ask the Court to limit Plaintiff's claims to the three years prior to the filing of his Amended Complaint on December 22, 2014, pursuant to the statute of limitations for claims filed pursuant to § 1983. In Response, Plaintiff maintains that Defendants have subjected him to continuous, solitary confinement since 1999, without meaningful classification reviews, thereby punishing him for past misconduct.

According to the undisputed facts, Plaintiff was sentenced to death and committed to the ADC on January 14, 1999. (Doc. No. 40-1, p. 5) On January 24, 2006, his death sentence was reversed and he was resentenced to life without parole. (Id.) He was then placed in ad seg at the

4

VSM, where he remained until he was transferred to ad seg at the East Arkansas Regional Unit in October, 2006. (Id., p. 19-20) Prior to the transfer, Plaintiff received a major disciplinary violation on September 7, 2006, for failure to obey staff orders and unauthorized use of state property. (Doc. No. 40-8, p. 17) He received other disciplinary charges on November 24, 2007 (for creating unnecessary noise, assault, using abusive/obscene language, and failure to obey staff orders); January 9, 2008 (failure to obey staff orders, assault, purchase of unauthorized articles, unauthorized use of mail/phone, possession/introduction of clothing); and January 24, 2008 (insolence to staff, failure to obey staff orders, assault), and was transferred back to VSM on January 24, 2008. (Doc. No. 40-1, p. 17) He was transferred to the Maximum Security Unit on April 29, 2008, where he was housed in ad seg, and received disciplinary charges on May 5, 2008 (tampering with lock, failure to obey staff), and June 2, 2008 (counterfeiting). (Id., p. 15) He was assigned to ad seg from July, 2008, until January 2009, when he was released to general population. (Id., pp. 14-15) He was assigned a job as a barracks porter, which permitted access to the barracks area, on April 18, 2009, but was charged with a disciplinary on May 8, 2009. (Id., p. 14) He was released to general population on June 17, 2009, and was assigned to hoe squad/field utility. (Id.)

About August 23, 2009, Plaintiff was involved in a fight with another inmate, which resulted in his assignment to ad seg and then punitive isolation. (Id., p. 13) He received another disciplinary charge on October 9, 2009 (failure to obey staff, insolence to staff, and abusive/obscene language). Id.) He was released from ad seg in June, 2010, and placed in general population. (Id., p. 12) However, about July 16, 2010, Plaintiff physically assaulted a staff member, causing injury, and was transferred back to VSM and placed in the 18-month behavior incentive program. (Id., pp. 11-12) Although the program is designed to be completed within 18 months, Plaintiff did not complete the

program until January 14, 2014. (Doc. No. 40-3, p. 7) During that time period, he received six major disciplinary charges. (Id.; Doc. No. 40-1, pp. 6-11)

The Court agrees with the Defendants that the applicable statute of limitations in § 1983 actions is three years. See Wilson v. Garcia, 471 U.S. 261 (1985); Sanchez v. United States, 49 F.3d 1329 (8th Cir. 1995). As applied to this case, Defendants' conduct/actions prior to December 3, 2011, would be excluded since Plaintiff filed his complaint on December 3, 2014. Therefore, in order to consider Plaintiff's complaint allegations as extending from 1999 until the present, the Court would need to find that Defendants' alleged violations were continuing. See Ashley v. Boyle's Famous Corned Beef Co., 66 F3d 164 (8th Cir. 1999) (abrogated on other grounds in Rowe v. Hussmann Corp., 381 F.3d 775, 782 n. 6 (8th Cir. 2004). "When a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." Wright v. O'Hara, No. CIV.A. 00-1557, 2002 WL 1870479 (E.D.Pa. 2002) (quoting Brenner v. Local 514, United Bhd of Carpenters and Joiners of Am., 927 F.2d 1283, 1295 (3d Cir. 1991). The Court in Wright noted that in deciding whether conduct is part of a continuing practice, courts should consider three factors: "(1) subject matter – whether the violations constitute the same type of [harm], tending to connect them in a continuing violation; (2) frequency – whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence – whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights..." Id. at * 4.

Applying those factors to this case, and considering Plaintiff's allegations, the time-line of his movement in and out of ad seg and punitive, and his numerous disciplinary charges, the Court

6

finds that it should not consider the time period prior to his entry into the incentive level program, on July 21, 2010. From 1999, until January, 2006, Plaintiff was housed on death row, based on his conviction. Therefore, the circumstances of his incarceration during that time period differ from his incarceration after his sentence was reversed to life in prison. In addition, from January, 2006, until his placement in the incentive program (2010), he was transferred back and forth between units, and between ad seg, punitive, and general population, based on his disciplinary and class status. It was not until he was placed in the VSM incentive program in July, 2010, that he remained consistently incarcerated in an ad seg-type of status. Therefore, the Court finds that the relevant time period for Plaintiff's complaint begins with his placement in the incentive program in July, 2010.

    **C.**    **Due Process Violations**

        **1.**    **Defendants' Motion**

Defendants first state that sufficient basis in the record exists to support their confinement of Plaintiff in the incentive program from July, 2010, until January, 2014, and in ad seg since January 2014. They also note Plaintiff was charged with six disciplinaries from July, 2010, until October, 2013, and that he has provided no proof that his incarceration conditions were atypical and significant and therefore, in violation of due process. In support of their Motion, Defendants provide information concerning the incentive level program, the periodic classification reviews provided to the Plaintiff, and declarations from some of the Defendants.

According to VU 27.3.0, which sets forth the incentive level program, the program is "designed to assist inmates in learning to modify their behavior...by learning to live within the rules and expectations of the correctional setting. (Doc. No. 40-4, p. 10) Inmates begin the program at the lowest level (1), have the fewest privileges, and are evaluated after 90 days. (Doc. No. 40-4, p.

4) Inmates in this level may view television, purchase some commissary items, make one telephone call per month, possess library, personal, and religious books, and may have one hour-long non-contact visit after sixty days of satisfactory behavior. (Id., p. 5) Responsibilities and privileges increase throughout the levels as proper and appropriate behavior is displayed. (Id.) Major rule violations are not tolerated and can result in the inmate being demoted back to level 1. (Id., p. 10)

  Defendant Jackson stated in his declaration that he is familiar with Plaintiff and had several interactions with him when Plaintiff was housed at the Units where Jackson was employed. (Doc. No. 40-3, p. 2) Plaintiff's placement in the incentive program followed his conviction in July, 2010, for battery on a staff member. (Id., pp. 6-7) Plaintiff received classification hearings during his assignment to the program, during which he also received six major disciplinary charges. (Id., p. 7) In order to be released from the incentive program, Plaintiff had to obtain Level 5 (of 5 levels) and Class 1-C, and had to receive the recommendation of the classification committee and approval of the Unit Warden. (Id., pp. 7-8) After Plaintiff completed the program, he continued to receive thirty and sixty-day reviews. (Id., p. 8) He was retained in ad seg on February 3, 3014, because he recently completed the incentive level program one month prior to that. (Id.) On March 30, 3014, the committee (chaired by Jackson) recommended a possible release of Plaintiff to general population but the Warden did not approve this recommendation. (Id.) On May 28, 2014, the committee (again chaired by Jackson) recommended Plaintiff be placed on a transfer list, but his custody level requires that he be housed in a maximum security unit. (Id.) The committee (chaired by Jackson) again recommended Plaintiff be released to general population on July 23, 2014, but a deputy warden who is not a party to this lawsuit, rejected the recommendation. (Id., p. 9) Plaintiff received an annual Warden's review on September 19, 2014, and waived his attendance at the sixty-day review on

November 10, 2014. (Id.) He continued to receive thirty- and sixty-day reviews, and waived his appearance at the March 3, 2015 review. (Id.) According to Jackson, he voted twice for Plaintiff's release to population and once to add him to the transfer list. (Id., p. 10) He was not involved in any of Plaintiff's classification hearings after March 3, 2015. (Id.) Jackson stated that his votes took into consideration Plaintiff's institutional history, disciplinary history, the length of time it took him to complete the 18-month program, and other information presented during classification hearings, including Plaintiff's comments and demeanor. (Id.)

Defendant Banks stated in his declaration that he was Warden at VSM from March 2010, until January, 2013, and knew Plaintiff since 2000. (Doc. No. 40-5, p. 1) He recalled constant problematic behavior by Plaintiff and chaired two annual warden review hearings related to him, all of which occurred before Plaintiff completed the incentive level program. (Id., p. 2) On December 14, 2010,[2] Plaintiff had reached level 4 of the program, but a disciplinary in January, 2011, resulted in his placement back to level 1. (Id., p. 2) He received another disciplinary in March, 2012, at which time he was told he needed to communicate better and responded that "I'm not kissing no ass." (Id., p. 3) He obtained level 2 by September, 2012, and level 3 by December, 2012 (Id). Defendant Banks attended warden review hearings on December 14, 2011, and September 19, 2012, and a Director's review on December 10, 2012. (Id., p. 2) At the time Banks left VSM in January, 2013, Plaintiff had not yet completed the program. (Id., p. 3)

Defendant Watson stated that he became VSM warden in January, 2012, and is familiar with Plaintiff. (Doc. No. 40-6) Watson stated he remanded the classification committee's

---

[2]Although Banks stated this date as December, 2011, the records support the fact that he actually meant December, 2010 (Doc. No. 40-1, p. 10).

9

recommendation that Plaintiff be assigned to general population for further review on March 30, 2014, due to Plaintiff's violent history, the length of time it took him to complete the 18-month program, and because he just recently completed the program. (Id., p. 2) Watson did not participate in the decision to reject the committee's July, 2014 recommendation that Plaintiff be released to general population, because he was not at work. (Id.) He chaired Plaintiff's Warden's reviews in September, 2014, and in September, 2015. (Id., p. 3) The purpose of the reviews was to give Plaintiff a chance to discuss concerns and problems, and to give Watson the chance to verify that Plaintiff could comply with rules and conform his behavior to that which is acceptable for assignment to general population. (Id.) During the September, 2015, review, Plaintiff explained some programs in which he had participated and presented some mental health concerns. (Id.) Watson suggested Plaintiff talk to mental health, given his issues and past violent history, believing those issues could affect Plaintiff's ability to control his temper in general population. (Id.) Watson stated that Plaintiff's attitude does not demonstrate a readiness for general population, because his behavior in September, 2015, was highly agitated and Plaintiff became upset over questions about his behavior and readiness for general population. (Id.) Finally, Watson stated that Plaintiff becomes extremely upset, defiant, and verbally abusive when he is questioned or his requests are denied, and has not genuinely changed his attitude, which is necessary for his transition to general population. (Id., p. 4)

Defendant Harris's contact with Plaintiff was limited to a single director's review of Plaintiff's ad seg confinement on December 4, 2014 (Doc. No. 40-7, p. 8) According to this review, Plaintiff asked to be released to general population, and Harris asked him how he would deal with the younger population there. (Id.) Plaintiff responded that he would mind his own business. (Id.)

According to Administrative Directive (AD) 11-42, which covers assignments to ad seg, an inmate's assignment must be reviewed by the classification committee every seven days for the first two months, and every thirty days thereafter to determine if the reason for placement continues to exist. (Doc. No. 40-9, p. 4) The inmate is also personally interviewed at every other one of the thirty day reviews by the classification committee or authorized staff. (Id.) No inmate may remain in ad seg for more than one year unless he is personally interviewed by the Warden at the end of one year and the action is approved by him. (Id.)

As noted in the declarations set forth above, following his completion of the incentive level program in January, 2014, Plaintiff was assigned to ad seg, based on the seriousness of the offense that resulted in his placement on maximum security status (Plaintiff's life sentence for murder) and his threat to the security and good order of the institution. (Doc. No. 40-7, p. 2) The committee voted for Plaintiff to remain in ad seg during the February 14, 2014 review, citing Plaintiff's recent completion of the incentive level program. (Id., p. 3) The Committee voted for possible release to general population on April 3, 2014, and Warden Watson referred the issue back to the committee for further review. (Doc. No. 51, p. 331)[3] The committee then recommended Plaintiff be placed on a transfer list, on May 29, 2014. (Doc. No. 40-6, p. 5) On July 25, 2014, most of the committee members voted for Plaintiff's "possible release" to general population, but the recommendation was referred back to the committee by a non-party. (Id., p. 6) On September 23, 2014, the committee voted for Plaintiff to remain in ad seg, noting he had been placed on a transfer list. (Id., p. 7) Plaintiff

---

[3]As stated by Warden Watson in his declaration, he remanded the recommendation for further review, based on Plaintiff's violent history, the length of time it took for him to comply with and complete the 18-month program, and because he had only recently completed the program. He "wanted to ensure that there was a thorough examination of Plaintiff's readiness for assignment to general population." (Doc. No. 40-6, p. 2)

waived his presence at the November 17, 2014 hearing, at which the committee voted that he remain in ad seg, due to his threat to the security and good order of the institution. (Doc. No. 51, p. 335) On December 4, 2014, the committee recommended he remain in ad seg. (Doc. No. 40-7, p. 8) On January 15, 2015, the committee recommended Plaintiff remain on ad seg, finding him a threat to the security and good order of the institution. (Doc. No. 51, p. 369) Plaintiff waived his appearance at the March 5, 2015, and June 24, 2015 hearings. (Id., pp. 370-372)

Defendants also state that Plaintiff showed a lack of authenticity and genuineness in his deposition testimony. (Doc. No. 40-10) He admitted that his temper might flare during classification hearings, and referred to the incentive level program as a joke and useless. (Id., p. 13) He also stated he does not believe the program helped him change in any way, which Defendants believe poses a threat to the safety and order of the institution. (Id., pp. 16-17) Finally, Plaintiff stated in his deposition that his case was not about the VSM levels of the incentive program, but rather, about being "locked down." (Id., p. 4)

Finally, Defendants state Plaintiff failed to support his claim that his incarceration in ad seg resulted in an atypical and significant deprivation, as set forth in Sandin v. Conner, 515 U.S. 472, 484 (1995). When questioned in his deposition, Plaintiff was not able to identify any specific conditions of his confinement in ad seg which are not provided to general population inmates. For example, although he claimed telephone usage is restrictive, he also admits he does not use the telephone. (Doc. No. 40-10, p. 12) He admitted that he possesses all his property, which includes a religious text and legal work. (Id.)

    **2.**    **Plaintiff's Response**

In his Response, Plaintiff attempts to refute or challenge the facts underlying many of his

disciplinary convictions. He claims that the evidence relied upon at his periodic reviews was false and states that although he was in general population one or more times, it was restrictive, because he remained incarcerated at a maximum security unit. He disputes the facts set forth by Defendants concerning the incentive program and denies receiving reviews on several dates in 2014 and 2015. He denies that the incentive program helped him to change and claims Defendants Harris, Banks, and Jackson mis-labeled him as insubordinate and a trouble-maker. He also claims Jackson convinced the classification committee in 2014 not to promote him, based on actions which occurred in 2007.

### 3.     Analysis

In <u>Sandin v. Connor</u>, the Court held that inmates do not possess a due process liberty interest in freedom from administrative or punitive segregation. 515 U.S. at 484. Recognizing, however, that states may themselves create certain protected liberty interests, the Court noted that those would be "limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause...imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Id</u>. The Court also instructed courts to consider the length of time of the confinement at issue, the extent to which the segregation conditions differ from other routine prison conditions, and the duration of the segregation imposed compared to discretionary confinement. <u>Id</u>. at 484.

The United States Court of Appeals, Eighth Circuit, held that administrative and disciplinary segregation are not atypical and significant deprivations within the meaning of <u>Sandin</u>. See <u>Portley-El v. Brill</u>, 288 F.3d 1063, 1065-66 (2002) (no liberty interest in thirty days' disciplinary confinement); <u>Hemphill v. Delo</u>, 124 F.3d 208 (1997) (unpublished per curiam) (four days on lock-

down, thirty days in punitive segregation, and 290 days on ad seg did not create a liberty interest.)

In <u>Shoats v. Horn</u>,, the Court held that an inmate's eight-year stay in the ad seg unit of a correctional facility was "not only atypical, but is indeed, unique." 213 F.3d 140 (3d Cir. 2000) In reaching this decision, the Court noted that the <u>Sandin</u> court considered two factors in determining if a state created a liberty interest in freedom from confinement in disciplinary segregation. Those factors were the amount of time the prisoner was placed in the segregated environment, and whether the conditions of his confinement in segregation were significantly more restrictive than those imposed on other inmates in solitary confinement. Although finding that plaintiff's confinement was atypical, the court in <u>Shoats</u> went on to find that the annual review procedures provided to the plaintiff met due process requirements. In addition, although the plaintiff in <u>Shoats</u> argued that his continued confinement was based solely on past crimes and incidents which had no contemporaneous justification, the Court stated that the prison's assessment that he constituted a threat to the security and order of the institution and safety of others was adequately supported by their annual reviews and impressions of him. The Court added that "predictions of likely future behavior based on a generally volatile criminal character have been upheld by the Supreme Court" <u>Shoats</u>, 213 F.3d at 146, citing <u>Hewitt v. Helms</u>, 459 U.S. 460, 474 (1983).

In <u>Rahman X v. Morgan,</u> the court held that Rahman's assignment to in-house segregation for twenty-six months was supported by evidence that he was not subjected to the same hardships that other prisoners placed in that area for punitive reasons faced. 300 F.3d 970, 973-4 (8th Cir. 2002). In addition, Plaintiff was given sufficient process by prison officials and his assignment was reconsidered every sixty days. <u>Id</u>. at 974. The Court held that plaintiff's complaints that he lacked ball-point pens or could not watch television in his cell were not necessary for a civilized life, and

that his deprivations were not sufficiently serious to establish an Eighth Amendment violation. Id.

In Williams v. Norris, however, the Court held that nine continuous years in administrative segregation were atypical and significant, and that the periodic reviews provided to Williams were not meaningful, because Defendants did not offer evidence about Williams' behavior or demeanor while in ad seg, from which it could be concluded that he had a volatile or disruptive character. 277 Fed.Appx 647 (8th Cir. 2008) (unpublished opinion). Finally, in Jones v. Walker, the court found that an inmate's placement in ad seg for more than one year, based on his threat to the security and good order of the institution, was not atypical or significant so as to constitute a violation of due process. No. 5:07CV00094-WRW-HDY, 2007 WL 1582835 (E.D. AR 2007)

In this particular case, the Court finds that Plaintiff's confinement could be considered atypical when one looks at the length of time spent in the incentive program, together with the ad seg confinement thereafter. However, the Court also finds that the time Plaintiff spent in the incentive level program could have been much shorter, had he not committed six disciplinary violations. While Plaintiff attempts to challenge the facts underlying many of those disciplinaries, he provides no proof that any of the convictions were reversed on appeal. In addition, while he also claims his reviews were not meaningful, he does not provide proof to support his claim, and he does not deny that defendants provided thirty and sixty-day classification reviews, that plaintiff was present at such reviews and was provided an opportunity to speak at those reviews. In fact, he waived his presence during several of the reviews. During his time in the incentive level program, he was given credit for disciplinary-free behavior and was permitted to promote to less-restrictive levels, at which times his privileges were increased. However, his disciplinary history supports his regression in those levels and inability to succeed within the regular eighteen-month time period.

(Doc. No. 51, pp. 224-237)

Once Plaintiff completed the program, he again received thirty and sixty-day reviews, at which times some committee members were inclined to recommend him for placement in general population. (Doc. No. 40-7) However, according to Defendant Watson, the first recommendation was sent back to the committee for further consideration, given Plaintiff's recent completion of the incentive program. (Doc. No. 40-6) In addition, a non-party was responsible for rejecting another committee recommendation, and Watson's decision to continue to retain Plaintiff in ad seg is well-supported by his reasons, and by Plaintiff's record. Plaintiff also provides no evidence that Defendants Banks and Harris conducted meaningless reviews. The Court notes that Plaintiff provides no proof that the other aspects of his conditions of confinement are atypical. According to the ad seg policy, inmates receive regularly-scheduled meals; television and radio privileges; opportunities to participate in institutional activities; mail privileges; chaplain visits on request; visitation; medical, dental and mental health services; five hours exercise per week, outdoors, weather permitting; commissary orders; and reading and educational materials. (Doc. No. 40-9, p. 3) In his deposition, Plaintiff stated that he possesses all of his property, but complained that his body is weak and is deteriorating. (Doc. No. 50, p.11) Although he admitted that he is permitted to attend yard call daily, and can exercise in his cell, he complained that he has been denied yard call more than ten times in the past year. (Id, pp. 11-12) He admitted that he visits the doctor, that he weighs almost 313 pounds, and that he does not utilize the diet tray. (Id., pp. 12-13) He also admitted that he does not use the telephone, and claimed that if he was housed in general population, he could work. (Id., p. 14) Finally, the Court notes that at the time Plaintiff filed his Complaint, on December 3, 2014, he had been housed in ad seg for approximately eleven months.

Therefore, although the Court finds that the combined length of time Plaintiff spent in ad seg and the incentive program may be considered atypical, he provides no proof that his conditions of confinement were atypical and significant departures in relation to the ordinary incidents of prison life, as set forth in Sandin. In addition, Plaintiff provides no proof that the reviews he was provided were not meaningful or that the committee's decisions were not well-supported. Therefore, the Court finds as a matter of law that Plaintiff's due process rights have not been violated with respect to his confinement in the incentive level program and ad seg housing.

**IV.    Conclusion**

IT IS, THEREFORE, RECOMMENDED that Defendants' Motion for Summary Judgment (Doc. No. 40) be GRANTED, and Plaintiff's complaint be DISMISSED with prejudice.

IT IS SO RECOMMENDED this 14th day of January, 2016.

_____
JEROME T. KEARNEY
UNITED STATES MAGISTRATE JUDGE